UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


KEITH PEARSON,
      Plaintiff,


      v.                                    CIVIL ACTION NO.
                                            08-11733-NMG


MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY,
      Defendant.

**REPORT AND RECOMMENDATION RE:**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 14)**

**February 3, 2012**
**BOWLER, U.S.M.J.**

     Pending before this court is a motion for summary judgment
filed by defendant Massachusetts Bay Transportation Authority
("MBTA" or "defendant") pursuant to Rule 56, Fed. R. Civ. P.
("Rule 56").  (Docket Entry # 14).  Plaintiff Keith Pearson
("plaintiff") filed an opposition (Docket Entry # 18) and, after
conducting a hearing, this court took the motion for summary
judgment (Docket Entry # 14) under advisement.


PROCEDURAL HISTORY

     The four count first amended complaint alleges violations
of:  (1) Massachusetts General Laws chapter 151B ("chapter 151B")
based on race discrimination (Count One); (2) 42 U.S.C. § 2000(e)

("Title VII") based on race discrimination (Count Two); (3) chapter 151B based on retaliation (Count Three); and (4) Title VII based on retaliation (Count Four). (Docket Entry # 3). Because defendant neglects to move for summary judgment on one of the discrimination claims in counts one and two, the first amended complaint and the basis for the summary judgment motion warrant a brief discussion.

Fairly read, the first amended complaint alleges that plaintiff's October 2006 suspension and recommendation for termination and the May 3, 2007 termination were based on his race, African American, in violation of Title VII and chapter 151B. (Docket Entry # 3, ¶¶ 10-18 & 26-33). Defendant seeks summary judgment on these discrimination claims because plaintiff cannot show: (1) he was meeting the legitimate expectations of the MBTA; and (2) the MBTA's business reason for the termination was a pretext for discrimination. (Docket Entry # 14; Docket Entry # 15, §§ B(1) & (B)(2)).

The first amended complaint also includes Title VII and chapter 151B retaliation claims because defendant terminated plaintiff in retaliation for writing a letter to the late Senator

Edward M. Kennedy ("Senator Kennedy").[1]  (Docket Entry # 3, ¶¶ 10,

19-21, 27-29 & 34-37).  Defendant moves for summary judgment on

these claims due to the absence of a causal connection between

the protected activity of writing the letter to Senator Kennedy

and the termination.  (Docket Entry # 14; Docket Entry # 15, §

C(1)).

        Next, the first amended complaint sets out Title VII and

chapter 151B retaliation claims based on conduct that took place

after an Arbitrator ordered plaintiff reinstated in October 2007

and after plaintiff returned to work in January 2008.  (Docket

Entry # 3, ¶¶ 4, 10, 22-29 & 34-37).  Plaintiff alleges that

defendant engaged in unlawful retaliation because he filed

discrimination and retaliation charges with the Massachusetts

Commission Against Discrimination ("MCAD") and the United States

Equal Employment Opportunity Commission ("EEOC") on August 3,

2007.  (Docket Entry # 3, ¶¶ 4, 10, 22-29 & 34-37).  Defendant

seeks summary judgment on these retaliation claims because

plaintiff did not suffer an adverse employment action after his

---

        [1]  The letter to Senator Kennedy complained about the unfair
treatment plaintiff received due to his race.  (Docket Entry # 3,
¶ 19).  On December 7, 2006, Senator Kennedy's office wrote to
plaintiff and "sent an inquiry to the MBTA."  (Docket Entry # 3,
¶ 20).

return to work and he cannot establish the requisite causal link.
(Docket Entry # 14; Docket Entry # 15, § C(2)).

Finally, the first amended complaint includes Title VII and
chapter 151B discrimination claims because defendant
discriminated against plaintiff after the Arbitrator ordered
plaintiff reinstated in October 2007 and after plaintiff returned
to work in January 2008. (Docket Entry # 3, ¶¶ 10, 22-29 & 34-
37).[2] Defendant acknowledges that these claims exist both in the
summary judgment motion (Docket Entry # 14) ("In his First
Amended Complaint, the Plaintiff alleges . . . that the Authority
*further discriminated* and retaliated against him following his
return to work in January 2008") (emphasis added) and in the
supporting memorandum (Docket Entry # 15, p. 2) ("In his First
Amended Complaint, the Plaintiff alleges that . . . that the
Authority *further discriminated* and retaliated against him
following his return to work in January 2008") (emphasis added).

---

[2] For example, paragraph ten alleges that, "In the time
since Plaintiff was ordered returned to work by an Arbitrator in
October 2007, Plaintiff has been further *discriminated* and
retaliated against by Defendant, as is set forth in detail
below." (Docket Entry # 3, ¶ 25) (emphasis added). Paragraph 25
states that, "Since his return to work, Plaintiff has been
*discriminated* against and retaliated against in a number of ways
by the MBTA, including but not limited to the following" and then
lists 15 instances of discriminatory and retaliatory treatment.
(Docket Entry # 3, ¶ 25) (emphasis added).

Defendant nevertheless limits its discussion and argument of the discrimination claims to the discrimination based on the suspension and termination and the allegations of misconduct occurring prior to October 7, 2006.[3]  Defendant fails to address or identify the basis for seeking summary judgment on the claims that defendant engaged in race discrimination after the Arbitrator's October 2007 decision and after plaintiff's return to work in January 2008.  Defendant therefore fails to satisfy its initial summary burden relative to these claims.  See Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010) ("moving party bears the initial burden of informing the trial court of the basis for his motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that demonstrate the absence of any genuine issue of material fact") (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Accordingly, these Title VII and chapter 151B discrimination claims remain in this action.

---

[3]  Defendant argues that the pre-October 7, 2006 discriminatory conduct occurred more than 300 days prior to the August 3, 2007 filing of the MCAD and EEOC charges.  Defendant submits that the continuing violation doctrine does not make these allegations (Docket Entry # 3, ¶ 12) timely and, in any event, the alleged misconduct is not probative of any racial animus.

## STANDARD OF REVIEW

Summary judgment is appropriate when "'the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law.'"  <u>Feliciano De La
Cruz v. El Conquistador Resort</u>, 218 F.3d 1, 5 (1st Cir. 2000)
(quoting Rule 56 in employment discrimination case).  In this
respect, a "genuine" issue exists if the evidence is such that a
reasonable fact finder could return a judgment in favor of the
nonmoving party.  <u>Celotex v. Carrett</u>, 477 U.S. at 322-323; <u>Oliver
v. Digital Equipment Corp.</u>, 846 F.2d 103, 105 (1st Cir. 1988).  "A
fact is material if it carries with it the potential to affect
the outcome of the suit under the applicable law."  <u>American
Steel Erectors, Inc. v. Local Union No. 7, International
Association of Bridge, Structural, Ornamental & Reinforcing Iron
Workers</u>, 536 F.3d 68, 75 (1st Cir. 2008).

"Even in employment discrimination cases 'where elusive
concepts such as motive or intent are at issue,' this standard
compels summary judgment if the non-moving party 'rests merely
upon conclusory allegations, improbable references, and
unsupported speculation.'"  <u>Feliciano De La Cruz v. El</u>

Conquistador Resort, 218 F.3d at 5. Courts should nevertheless "exercise particular caution before granting summary judgment for employers on such issues as pretext, motive and intent." Santiago-Ramos v. Centennial P.R. Wireless Corporation, 217 F.3d 46, 54 (1st Cir. 2000); accord Lipsett v. University of Puerto Rico, 864 F.2d 881, 895 (1st Cir. 1988) (recognizing in sex discrimination case that summary judgment "test remains particularly rigorous when the disputed issue turns on a question of motive or intent").

In support of summary judgment, defendant filed a statement of undisputed material facts ("SUMF") under LR. 56.1. (Docket Entry # 16). In opposition, plaintiff filed a statement of material facts to which there exists a genuine issue to be tried ("SOF") pursuant to LR. 56.1. (Docket Entry # 19). Uncontroverted statements of fact in a LR. 56.1 statement comprise part of the summary judgment record. See Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003) (the plaintiff's failure to contest date in LR. 56.1 statement of material facts caused date to be admitted on summary judgment); Stonkus v. City of Brockton School Department, 322 F.3d 97, 102 (1st Cir. 2003) (citing LR. 56.1 and deeming admitted undisputed material facts that the plaintiff failed to controvert).

Finally, reviewing all of the evidence in the record as a whole, see Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150-151 (2000), this court draws all reasonable inferences in favor of plaintiff as the nonmoving party. See Williams v. Raytheon Company, 220 F.3d 16, 19 (1st Cir. 2000) (Title VII gender discrimination case).

## FACTUAL BACKGROUND

Defendant hired plaintiff, an African American, in 1990 as a "Local 103 Wireperson," also referred to as a "Maintainer." (Docket Entry # 16, ¶ 4). In 1994, plaintiff was promoted to the "Alliance bargaining unit position" of signal inspector. (Docket Entry # 16, ¶ 4). The signal department controls the movement of trains. (Docket Entry # 16, ¶ 5). A signal inspector oversees a team of maintainers to ensure that appropriate maintenance is performed and problems with service are resolved quickly. (Docket Entry # 16, ¶ 5).

At all relevant times, there were six signal inspectors. (Docket Entry # 16, ¶ 6). Each signal inspector was assigned to one of three shifts: the day shift of 7 a.m. to 3 p.m.; the second shift of 3 p.m. to 11 p.m.; or the third shift of 11 p.m. to 7 a.m. (Docket Entry # 16, ¶ 6). Signal inspectors were responsible for covering between two and four subway lines, i.e.,

red, orange, blue and green, depending on the day and the shift. (Docket Entry # 16, ¶ 6).

Signal inspectors reported to maintenance supervisors. (Docket Entry # 16, ¶ 7). During the relevant time period, there were four maintenance supervisors: Russell Fairhurst, an African American ("Supervisor Fairhurst"); Ernest Morrison, also an African American ("Supervisor Morrison"); John McCabe, a Caucasian ("Supervisor McCabe"); and Jan Hagan, another Caucasian ("Supervisor Hagan"). (Docket Entry # 16, ¶ 7). The maintenance supervisors reported to Superintendent of the Signal Department, Thomas Cary, a Caucasian ("Superintendent Cary"). (Docket Entry # 16, ¶ 8). Superintendent Cary, in turn, reported to the Deputy Director of Signals and Communications, Peter Bertozzi, a Caucasian ("Deputy Director Bertozzi"). (Docket Entry # 16, ¶ 9). Deputy Director Bertozzi reported to the Director of Systemwide Maintenance and Improvements, John Lewis, an African American ("Director Lewis"). (Docket Entry # 16, ¶ 10). Director Lewis reported to the Senior Director of Infrastructure and Engineering, Charles O'Reilly, a Caucasian ("Senior Director O'Reilly"). (Docket Entry # 16, ¶ 11). Daniel Grabauskas ("General Manager Grabauskas") was general manager of the MBTA during the relevant time period.

Plaintiff's career at the MBTA is marked by discord culminating in a discharge and a subsequent reinstatement. Plaintiff characterizes defendant's actions as racially discriminatory and retaliatory. In contrast, defendant characterizes its actions as appropriate responses to plaintiff's ongoing insubordination and work performance issues.

Defendant asserts that during the course of plaintiff's employment he was disciplined on a number of occasions for a variety of reasons such as attendance, courtesy and insubordination. (Docket Entry # 16, ¶ 16). In contrast, plaintiff contends that defendant used discipline as tool to undermine and intimidate him. (Docket Entry # 19, Ex. B, p. 5). Construing the record in plaintiff's favor, the following is a catalogue of the incidents both plaintiff and defendant identify in support of their respective positions.

In January 2004, Superintendent Cary informed plaintiff that his new reporting headquarters would be at Riverside Station on the Green Line. (Docket Entry # 16, ¶ 13). At the time, plaintiff was assigned to the Green Line. (Docket Entry # 16, ¶ 13). Contrary to Superintendent Cary's direct command, plaintiff continued to use an office at Back Bay Station on the Orange Line. (Docket Entry # 16, ¶ 13).

On February 12, 2004, plaintiff received a three day suspension for an attendance problem. (Docket Entry # 19, Ex. B, p. 11). Plaintiff had a doctor's note verifying his absence for the stated period. (Docket Entry # 19, Ex. B, p. 11). Supervisor Fairhurst, Supervisor McCabe and Superintendent Cary conducted a disciplinary interview before issuing the discipline. (Docket Entry # 19, Ex. B, p. 11). Plaintiff was not represented by the union at the disciplinary meeting. (Docket Entry # 19, Ex. B, p. 11).

On April 23, 2004, while performing maintenance, plaintiff and his crew were assigned to an unsafe work area and subsequently found themselves in the path of a runaway train. (Docket Entry # 19, Ex. B, p. 18). Supervisor Morrison ordered plaintiff to work under conditions which plaintiff later deemed unsafe. (Docket Entry # 19, Ex. B, p. 18).

In June 2004, because plaintiff had far exceeded his allocated minutes, defendant disabled plaintiff's cellular telephone. Plaintiff still had his Nextel direct connect device available for communication. (Docket Entry # 16, ¶ 15). In October 2004, plaintiff and his team were ordered off of a rail "right of way" on which they were working by an "OCC Supervisor" who worked with Superintendent Cary. (Docket Entry # 19, Ex. B,

p. 13).  After plaintiff complained of harassment, Deputy
Director Bertozzi agreed to review taped telephone calls
regarding the incident but he never followed through.  (Docket
Entry # 19, Ex. B, p. 13).

In November 2004, plaintiff was disciplined for
insubordination after he allegedly failed to follow a directive
of Supervisor Fairhurst, an African American.  (Docket Entry # 19
¶ 1(b)).  Plaintiff and his team had been directed to fix a
problem at Arlington Station during the day shift.  (Docket Entry
# 19, Ex. A, p. 42).  Due to a delay in arrival, a lack of
materials and a safety issue, plaintiff's team did not accomplish
the task.  (Docket Entry # 19, Ex. A, pp. 42-43).  The task was
subsequently "pushed over" to the afternoon shift and then to the
night shift.  (Docket Entry # 19, Ex. A, p. 43).  Neither the
afternoon nor the overnight Signal Inspector, Jim Ford ("Ford"),
an African American, and Tom Pezzarossi, a Caucasian, were
interviewed regarding the incident nor were they disciplined.[4]
(Docket Entry # 19, Ex. A).

Because of plaintiff's disciplinary history and in
accordance with defendant's progressive disciplinary policy, this

_____

[4]  It is worth noting that these Signal Inspectors did not
ignore a supervisor's directive.

12

incident resulted in a five day suspension for plaintiff and placement on a final warning. (Docket Entry # 16, ¶ 16). Also in 2004, a computer that had been configured for plaintiff was taken from him by Supervisor McCabe. (Docket Entry # 19, ¶ 1(h), Ex. B, p. 15). Plaintiff was the only signal inspector without a working computer in 2004. (Docket Entry # 19-1, Ex. B, p. 15).

In July 2005, Supervisor McCabe changed a personnel list submitted by plaintiff for a particular assignment just before Supervisor McCabe left on vacation. (Docket Entry # 19, Ex. B, p. 14). Plaintiff further states that Supervisor McCabe was attempting to sabotage the project because Supervisor McCabe's wife, also an MBTA employee, had not been provided the opportunity to work overtime. (Docket Entry # 19, Ex. B, p. 7).

In the summer of 2005, Supervisor McCabe delayed payment of overtime to plaintiff and his team members. (Docket Entry # 19, Ex. B, p. 7). On September 23, 2005, plaintiff complained about the matter to Deputy Director Bertozzi. (Docket Entry # 19, Ex. B, p. 7). Two weeks later, Supervisor Fairhurst changed plaintiff's shift. (Docket Entry # 19, Ex. B, p. 7). When plaintiff asked Supervisor Fairhurst why his shift had been changed, Supervisor Fairhust told plaintiff that he needed to

talk to Deputy Director Bertozzi stating, "'this is personal
Keith, for the lawyer back in 2004.'" (Docket Entry # 19, Ex. B,
p. 7; Docket Entry # 19, Ex. A, p. 138). Plaintiff had retained
the services of an attorney for a 2004 attendance issue because
plaintiff felt the union was not properly representing his
interests. (Docket Entry # 19, Ex. A, pp. 139-140). The
attorney sent documentation of plaintiff's health issues to
Deputy Director Bertozzi. (Docket Entry # 19, Ex. A, pp. 139-
140). Deputy Director Bertozzi informed the attorney that
documentation was not necessary. (Docket Entry # 19, Ex. A, p.
140). Additionally, at the time of the shift change Deputy
Director Bertozzi told plaintiff that, "he [Deputy Director
Bertozzi] was trying to do something new in the department and
that I [plaintiff] was the first of many changes to come" when "I
[plaintiff] turned out to be the only change that was to come."
(Docket Entry # 19, Ex. A, p. 138).

As set forth in the SUMF, Deputy Director Bertozzi moved
plaintiff from the day shift to the second shift after several
instances of failing to respond in person to problems on the
tracks. (Docket Entry # 16, ¶ 17). Deputy Director Bertozzi
further states that he hoped plaintiff would have a better chance
to succeed on the less busy second shift. (Docket Entry # 16, ¶

17).  In addition to the disciplinary incidents previously
mentioned, disciplinary action was taken against plaintiff on
April 12, 1999, for working overtime without authorization and on
September 10, 2003, for which there is no specific information
provided.  (Docket Entry # 16, ¶ 38).

The differences between plaintiff and defendant culminated
in plaintiff's termination and subsequent reinstatement.  The
incident leading to the termination occurred on September 12,
2006.  On that date, between approximately 2:30 to 3:30 p.m., the
maintenance control center advised Supervisor Hagan, the
maintenance supervisor on duty, that there were multiple dropped
track circuits on the Orange Line southbound between Community
College Station and Sullivan Square Station.  (Docket Entry # 16,
¶ 18).

Supervisor Hagan dispatched two maintainers to investigate
the trouble call.  (Docket Entry # 16, ¶ 18).  At approximately
3:15 p.m., Supervisor Hagan called plaintiff, who was assigned to
work the second shift, and instructed him to dispatch the second
shift maintainers to Sullivan Square Station.  (Docket Entry #
16, ¶ 18).  Supervisor Hagan contends she directed plaintiff to
report to Sullivan Square Station to assist with troubleshooting.
(Docket Entry # 16, ¶ 18).  Supervisor Hagan also informed

15

plaintiff where to locate the blueprints necessary to resolve the problem. (Docket Entry # 16, ¶ 19). Supervisor Hagan told plaintiff she had to leave at 4:00 p.m. to teach a class but that plaintiff should keep her informed of the situation. (Docket Entry # 16, ¶ 19). Before leaving work, Supervisor Hagan informed Superintendent Cary of the situation and told him she had instructed plaintiff to go to Sullivan Square Station to resolve the problem. (Docket Entry # 16, ¶ 19).

The signal call persisted throughout the afternoon. (Docket Entry # 16, ¶ 20). The problem was finally resolved between approximately 6:30 and 7:00 p.m. (Docket Entry # 16, ¶ 20). At no time did plaintiff report to Sullivan Square Station. (Docket Entry # 16, ¶ 20).

The first call regarding the incident was received by a Ken Smith ("Smith") at 2:00 p.m., a Caucasian signal inspector. Smith, who plaintiff states followed proper procedure, took the same actions as plaintiff in response to the incident. Both sent maintainers to the scene of the incident to investigate and report back. Although both men took the same actions, Smith was not investigated or disciplined. There is however no indication that Smith failed to follow the direct order of a supervisor that day. (Docket Entry # 19, Ex. B).

On September 13, 2006, Superintendent Cary requested written statements from both Supervisor Hagan and plaintiff regarding the September 12, 2006 incident. (Docket Entry # 16, ¶ 20). On September 21, 2006, Supervisors Hagan and Fairhurst interviewed plaintiff regarding his failure to follow Hagan's direct order that plaintiff report to Sullivan Square Station on September 12, 2006. (Docket Entry # 16, ¶ 22). After considering the written statements and plaintiff's response at the disciplinary interview, Superintendent Cary discussed the appropriate disciplinary action to address plaintiff's insubordination with Deputy Director Bertozzi, Director Lewis and Senior Director O'Reilly. (Docket Entry # 16, ¶ 23). While discharge was the appropriate next step under the MBTA's progressive discipline policy, Superintendent Cary, Deputy Director Bertozzi, Director Lewis and Senior Director O'Reilly chose to recommend that plaintiff be demoted rather than discharged. (Docket Entry # 16, ¶ 23). On September 21, 2006, Superintendent Cary drafted a memo addressed to Deputy Director Bertozzi recommending that plaintiff be demoted back to wireperson rather than discharged and forwarded the letter to the labor relations department for review. (Docket Entry # 16, ¶ 24).

On September 29, 2006, Josh Coleman ("Coleman"), a labor

relations representative, requested that Superintendent Cary provide additional information regarding plaintiff's record and the September 12, 2006 incident. (Docket Entry # 16, Ex. 14). Coleman communicated with a business agent from Local 103 regarding the possibility of demoting plaintiff to wireperson. (Docket Entry # 16, ¶ 26). Coleman recalls that because plaintiff had not kept current with his Local 103 union dues plaintiff may not have had the right to "drop-back" and potentially bump a more junior employee. (Docket Entry # 16, ¶ 26). Furthermore, Coleman recalls that plaintiff, through a union representative, indicated he planned to grieve the discipline, whether it was a discharge or a demotion. (Docket Entry # 16, ¶ 26). Given these factors and plaintiff's disciplinary record, the labor relations department determined it was appropriate to discharge plaintiff and directed the signal department to proceed accordingly. (Docket Entry # 16, ¶ 26). Plaintiff received the discipline for the September 2006 incident two weeks before the expiration of any impact that his 2004 discipline would have on the severity of the 2006 discipline. (Docket Entry # 19, Ex. B).

Neither Superintendent Cary nor Deputy Director Bertozzi knows exactly who made the decision to terminate rather than

demote plaintiff.  (Docket Entry # 19, ¶ 4(a)).  Superintendent
Coleman stated that he and the Director of Labor Relations, Brian
Donohoe ("Donohoe"), made the decision to terminate plaintiff
after consulting with Superintendent Cary and Deputy Director
Bertozzi.  (Docket Entry # 19, ¶ 4(a)).  Supervisor Fairhust told
plaintiff that the termination was being pushed by the labor
relations department, not the signal department.  (Docket Entry #
19, ¶ 4(b)).  Supervisor Fairhust also told plaintiff that
"someone in Labor Relations has it out for you."  (Docket Entry #
19, ¶ 4(b)).  Union Representative Tom Pezzarossi ("Union
Representative Pezzarossi") likewise told plaintiff that somebody
in labor relations did not like him.  (Docket Entry # 19, ¶
4(b)).  At the time of the decision to terminate plaintiff,
neither Coleman nor Donohoe had ever met plaintiff; nor were they
aware of his race.  (Docket Entry # 16, ¶ 27).

On October 24, 2006, Supervisor Fairhurst issued plaintiff a
discipline slip stating that plaintiff had been found to be
insubordinate.  The slip informed plaintiff he was "hereby
suspended for thirty (30) days with a recommendation for
discharge."  (Docket Entry # 16, ¶ 28).

On November 6, 2006, plaintiff wrote to Senator Kennedy
complaining of the MBTA's treatment and the ongoing racial

difficulties at the MBTA.  (Docket Entry # 16, ¶ 29).  On

December 7, 2006, Senator Kennedy wrote to the MBTA referring to

the correspondence from plaintiff.  (Docket Entry # 16, ¶ 32).

Coleman prepared a draft response to Senator Kennedy and

forwarded the response to Donohoe.  (Docket Entry # 16, ¶ 32).

On January 5, 2007, Peter Murillo ("Murillo"), a civil rights

investigator from the MBTA's Office of Diversity and Civil Rights

("ODCR"), contacted plaintiff regarding the concerns he had

expressed to Senator Kennedy.  (Docket Entry # 16, ¶ 33).

Plaintiff and his attorney met with Murillo but when plaintiff

realized ODCR was interested in investigating race

discrimination, harassment and retaliation rather than

plaintiff's grievance regarding the termination plaintiff decided

not to pursue the matter with ODCR.  (Docket Entry # 16, ¶ 34).

On January 8, 2007, Donohoe notified plaintiff that the

grievance of the termination was denied.  (Docket Entry # 16, ¶

35).  Coleman drafted the denial.  (Docket Entry # 19, ¶ 4(f)).

At the time Coleman wrote the letter denying the grievance of

plaintiff's termination, Coleman was aware of plaintiff's

communication with Senator Kennedy.  (Docket Entry # 19, ¶ 4(f)).

On January 9, 2007, General Manager Grabauskas signed the

draft letter he had received from labor relations and sent it to

Senator Kennedy.  (Docket Entry # 16, ¶ 36).  The letter informed Senator Kennedy that plaintiff's grievance was being considered and that plaintiff would be contacted by ODCR regarding the concerns plaintiff expressed in the letter.  (Docket Entry # 16, ¶ 36).

Because only the general manager has authority to terminate an MBTA employee, it is standard protocol that when a department recommends discharge it prepares a memo to the labor relations department for review.  (Docket Entry # 16, ¶ 37).  The labor relations department then conducts its own review and a review of the applicable collective bargaining agreement and prepares its own recommendation for ODCR.  (Docket Entry # 16, ¶ 37).  After review by ODCR, the recommendation is forwarded to the general manager for review and appropriate action.  (Docket Entry # 16, ¶ 37).

On January 18, 2007, Deputy Director Bertozzi drafted a memo to Senior Director O'Reilly recommending that plaintiff be terminated.  (Docket Entry # 16, ¶ 38).  On February 2, 2007, Julie Hernandez, a labor relations representative, received an inquiry from Shirley Rhodes ("Rhodes"), a human resources administrator, regarding the status of the recommendation for discharge ("RFD"), which had been sent to the labor relations

department about a month earlier. (Docket Entry # 16, ¶ 39).

The labor relations department had apparently misplaced the RFD,

so Rhodes forwarded another copy of the packet. (Docket Entry #

16, ¶ 39).

On April 26, 2007, James Lavin, another labor relations

representative, sent a memorandum to Donohoe recommending that

plaintiff be discharged ("RFD memo"). (Docket Entry # 16, ¶ 40).

ODCR signed off on the RFD memo on April 30, 2007, and returned

it to Donohoe, who signed off on it on May 1, 2007. (Docket

Entry # 16, ¶ 40). On May 2, 2007, General Manager Graubauskas

approved plaintiff's discharge and a signed termination letter

was sent to plaintiff. (Docket Entry # 16, ¶ 41). The letter

set out two reasons for the discharge, to wit, violating Rule

Five for failing to obey Supervisor Hagan's order to report to

Sullivan Station and plaintiff's prior record. (Docket Entry #

16, Ex. 2, Tab 11).

On May 8 and August 6, 2007, an arbitration hearing

regarding the termination took place. (Docket Entry # 16, ¶ 43).

On October 22, 2007, the Arbitrator determined that the MBTA

lacked just cause to terminate plaintiff and ordered his

reinstatement. (Docket Entry # 16, ¶ 43). Specifically, the

Arbitrator found that Supervisor Hagan's directive that plaintiff

report to Sullivan Square Station was "nuanced enough to be subject to reasonable misinterpretation." (Docket Entry # 16, Ex. 2). Furthermore, the Arbitrator found that, "Even if [plaintiff] had understood that Hagan had expected him to oversee the Sullivan issue in person, it was not insubordinate to assume that the situation had been sufficiently resolved by personnel reporting ahead of him that it was acceptable to complete his monitoring without appearing in person." (Docket Entry # 16, Ex. 2). The Arbitrator cited defendant's "almost complete absence of any investigation of the grievant's defenses" as a contributing factor to her decision. (Docket Entry # 16, Ex. 2). Plaintiff was ordered reinstated with back pay and benefits. (Docket Entry # 16, ¶ 43).

On August 3, 2007, plaintiff filed a charge of discrimination on the basis of race and retaliation with the MCAD and the EEOC. (Docket Entry # 3, ¶ 4; Docket Entry # 6, ¶ 4). In September and October of 2007, ODCR followed up with plaintiff regarding his complaint of discrimination. Plaintiff chose not to open an investigation, "explaining he had already filed a charge with MCAD/EEOC." (Docket Entry # 16, ¶ 44).

In December 2007, the MBTA scheduled plaintiff for a return to work physical consistent with the MBTA's policy of having any

employee that had been on extended leave submit to a fitness for duty physical before resuming work. (Docket Entry # 16, ¶ 46). The MBTA failed to inform plaintiff that his back to work physical had been scheduled. (Docket Entry # 19, ¶ 5(a)). As a result, plaintiff failed to appear. (Docket Entry # 19, ¶ 5(a)). Subsequently, plaintiff received a letter from Coleman threatening to terminate plaintiff for insubordination. (Docket Entry # 19, ¶ 5(a)).

On or about January 7, 2008, plaintiff was reinstated to his position as signal inspector on the Red Line with the same rate of pay and level of responsibility that he had prior to the October 2006 suspension. (Docket Entry # 16, ¶ 50). On January 8, 2008, plaintiff applied for and was granted a leave of absence under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 et seq., from January 8 through February 4, 2008, so that he could obtain treatment for a shoulder injury he sustained in December 2007. (Docket Entry # 16, ¶ 51).[5]

On February 4, 2008, plaintiff submitted additional documentation to support a request to extend the FMLA leave through April 1, 2008, which was approved. (Docket Entry # 16, ¶

---

[5] The injury was not work related.

52). On or about April 1, 2008, plaintiff sought to extend his medical leave through May 2, 2008, and medical documentation in support of the request was faxed to the signal department. (Docket Entry # 16, ¶ 53).

On April 8, 2008, the fax came to Superintendent Cary's attention, who was surprised to see that it prohibited plaintiff from working at all because plaintiff, despite being approved for FMLA leave, had continued to work his regular shift and was simply going to physical therapy during his lunch break. (Docket Entry # 16, ¶ 54). Recognizing the possible liability, Superintendent Cary ordered plaintiff to stop working and leave defendant's property until the situation was resolved. (Docket Entry # 16, ¶ 54). On the same date, plaintiff's medical provider submitted revised paperwork stating that he was fit for duty. (Docket Entry # 16, ¶ 54).

Due to the discrepancy between the FMLA leave for which plaintiff was approved and the fact that plaintiff had actually been working, his request for an extension of continuous FMLA leave was denied on May 2, 2008, and plaintiff was directed to submit proper documentation for intermittent leave. (Docket Entry # 16, ¶ 55). On July 29, 2008, plaintiff submitted an application for intermittent FMLA leave through December 2008.

(Docket Entry # 16, ¶ 56).  On July 31, 2008, the MBTA notified
plaintiff that his request for intermittent FMLA leave was
approved through December 2008.  (Docket Entry # 16, ¶ 56).

After his return to work, plaintiff was frequently accused
of attendance violations.  (Docket Entry # 19, ¶ 4(k)).
Plaintiff was disciplined for absences in excess of those set out
in MBTA's attendance policy on June 24, September 5 and October
2, 2008.  (Docket Entry # 16, Ex. 34).  Plaintiff's September
2008 unexcused absence was due to a family emergency.  (Docket
Entry # 19, Ex. B, p. 8).  Plaintiff informed two individuals
prior to the start of his shift that he would be absent.  (Docket
Entry # 19, Ex. B, p. 8).  As a result of the incident, plaintiff
was suspended without pay.  (Docket Entry # 19, Ex. B, p. 8).

Additionally, plaintiff points out that Superintendent Cary
regularly denied him overtime assignments after his return to
work.  (Docket Entry # 19, ¶ 5(b)).  Superintendent Cary also
placed undue pressure on plaintiff to supply him with various
paperwork.  (Docket Entry # 19, ¶ 5(d)).

Furthermore, plaintiff was forced to continue sharing office
space with Kevin Vey ("Vey"), a fellow MBTA employee, after Vey
made racist comments to plaintiff.  (Docket Entry # 19, ¶ 5(e)).
Vey and plaintiff worked on overlapping shifts out of the same

office.  (Docket Entry # 19, Ex. A, p. 78).  Vey stated to

plaintiff, "How did you get here?  How did you get here before

me?  You must have been on a special list.  Blacks have

preference more so than whites do."  (Docket Entry # 19, Ex. A,

pp. 77-78).

Plaintiff complained to Superintendent Cary about the racist

comments made by Vey.  (Docket Entry # 19, Ex. A, pp. 78-79).

Thereafter, a "night detail" that plaintiff believes was

authorized by Superintendent Cary was assigned to plaintiff for

his protection.  (Docket Entry # 19, Ex. A, pp. 78-79).

Furthermore, Vey was instructed not to enter the office while

plaintiff was working but at times Vey ignored the instruction.

(Docket Entry # 19, Ex. A, p. 78).  Vey was not assigned to a

different location.  (Docket Entry # 19, Ex. A, p. 79).

Plaintiff was therefore forced to continue to share office space

with Vey.  (Docket Entry # 19, ¶ 5(e)).  In addition to making

racist comments to plaintiff, Vey damaged plaintiff's car.

(Docket Entry # 19, ¶ 5(e)).

Defendant contends plaintiff continued with a pattern of

insubordination after returning to work, citing as an example

plaintiff's attempts to set up an unauthorized office location at

South Station.  (Docket Entry # 16, ¶ 57).  In January 2008,

plaintiff requested installation of a telephone line to the unauthorized office but when Supervisor Morrison found out about it, the request was canceled. (Docket Entry # 16, Ex. 33).

From January to April 2009, plaintiff was out on medical leave. (Docket Entry # 19, Ex. C, p. 146). After plaintiff's return to work, he was removed from the signal inspector position on the Red Line and assigned to a "no name, no number" job. (Docket Entry # 19, Ex. C, p. 147). Plaintiff's new job responsibilities included inspecting "crossovers" and writing reports about them. (Docket Entry # 19, Ex. C, p. 148).

Plaintiff points out he was active throughout his career in supporting African Americans employed by the MBTA. The following is a list of examples provided by plaintiff. Plaintiff was a founding member and Vice President of the Louis H. Latimer's Progressive Association ("LLPA"). (Docket Entry # 19, Ex. B, p. 20). LLPA is composed of MBTA employees and electricians not employed by the MBTA that are associated with Local 103 IBEW. (Docket Entry # 19, Ex. B, p. 20). The purpose of LLPA is to promote the employment of persons of color within the electrical industry. (Docket Entry # 19, Ex. B, p. 20).

In the 1990s, plaintiff worked with key members of the MBTA to find ways to stop harassment and discrimination at the MBTA.

(Docket Entry # 19, Ex. B, p. 21).  In 2003, plaintiff assisted "MCC Clerks" with inter-personnel problems.  (Docket Entry # 19, Ex. B, p. 21).  Plaintiff recruited minorities for employment at Amtrak.  (Docket Entry # 19, Ex. B, p. 21).  Additionally, at some point in time, plaintiff attempted to mediate problems between Craig Greene, an African American maintainer, and other Caucasian maintainers.  (Docket Entry # 19, Ex. B, p. 20).  John Aylward from ODCR interviewed plaintiff regarding the incident. (Docket Entry # 19, Ex. B, p. 20).

Plaintiff also attempted to intervene on behalf of Jim Ford ("Ford"), an African American signal inspector, when the MBTA transferred Ford to the second shift against his will.  (Docket Entry # 19, Ex. B, p. 21).  In 2005, plaintiff assisted the family of O'Hillary Na ("Na"), after he was killed by an Orange Line train in an on the job accident while working for the MBTA. (Docket Entry # 19, Ex. B, p. 21).  According to plaintiff, Supervisor McCabe made inappropriate facial expressions during a eulogy plaintiff gave at Na's funeral.  (Docket Entry # 19, ¶ 1(j)).

## DISCUSSION

I.  Racial Discrimination Claims

In Count One under chapter 151B and Count Two under Title

29

VII, plaintiff alleges that defendant discriminated against him

on the basis of his race.  Defendant seeks summary judgment on

both claims.[6]

In analyzing racial discrimination, the court uses the

analytical framework outlined by the Supreme Court in McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1979), and Texas

Department of Community Affairs v. Burdine, 450 U.S. 248, 253-254

(1981) (McDonnell Douglas test").  This framework governs both

state and federal discrimination claims.[7]  See Douglas v. J.C.

Penney Company, Inc., 422 F.Supp.2d 260, 272 (D.Mass. 2006).

Under this framework, the plaintiff bears the initial burden of

establishing each element of his prima facie case.  McDonnell

---

[6]  As previously noted, counts one and two also include the
claims that defendant discriminated against plaintiff after the
Arbitrator's October 2007 decision and plaintiff's January 2008
return to work.  As also previously noted, these claims remain in
this action because the summary judgment motion fails to present
a basis for seeking summary judgment on these discrimination
claims.

[7]  As discussed infra, however, the state standard under
chapter 151B is more favorable to plaintiff in the area of
pretext and the ultimate showing of discriminatory intent.
Succinctly stated, "[O]nce a plaintiff has established a prima
facie case and further shows either that the employer's
articulated reasons are a pretext or by direct evidence that the
actual motivation was discrimination, the plaintiff is entitled
to recovery for illegal discrimination under G.L. c. 151B."
Blare v. Husky Injection Molding Systems Boston, Inc., 646 N.E.2d
111, 117 (Mass. 1995).

Douglass Corp. v. Green, 411 U.S. at 802.

If successful, this minimal showing functions to raise an
inference of discrimination.  Texas Department of Community
Affairs v. Burdine, 450 U.S. at 253.  The burden of production
then shifts "to the employer to articulate some legitimate, non-
discriminatory reason" for the employment action.  McDonnell
Douglas Corp. V. Green, 411 U.S. at 804.  "If the employer
articulates such a reason, 'the McDonnell Douglas framework-with
its presumptions and burdens-is no longer relevant'" and "'the
sole remaining issue [is] discrimination vel non.'"  Velez v.
Thermo King de Puerto Rico, Inc., 585 F.3d 441, 447 (1st Cir.
2009).  The plaintiff carries the final burden of "proving that
the legitimate reasons offered by the [employer] were not its
true reasons, but were a pretext for discrimination."  Texas
Department of Community Affairs v. Burdine, 450 U.S. at 253; see
Thompson v. Coca-Cola Co., 522 F.3d 168, 177 (1st Cir. 2008) (the
plaintiff employee "must prove not only that the reason
articulated by the employer was a sham, but also that its true
reason was [the] plaintiff's race or national origin"); Douglas
v. J.C. Penney Co., Inc., 474 F.3d 10, 14 (1st Cir. 2007) (if
"employer demonstrates such a reason, the burden returns to the
employee to show that the proffered reason was mere pretext, and

31

that the true reason was prohibited discrimination").

To establish a prima facie case of racial discrimination, plaintiff must show that: (1) he is a member of a protected class; (2) he was performing his job at an acceptable level; (3) he suffered an adverse employment action; and (4) his employer sought a replacement for him with roughly equivalent qualifications. See Rodriguez-Torres v. Caribbean Forms Manufacturer, Inc, 399 F.3d 52, 58 (1st Cir. 2005); Weber v. Community Teamwork, 752 N.E.2d 700, 704 (Mass. 2001); Douglas v. J.C. Penney Company, Inc., 422 F.Supp.2d at 273; Benoit v. Technical Mfg. Corp., 331 F.3d 166 (D.Mass. 2003).

A. Discriminatory Termination

    1. Prima Facie Showing

Plaintiff easily satisfies three of the four elements required to establish a prima facie case. Plaintiff is an African American and thus is a member of a protected class under both chapter 151B and Title VII. See 42 U.S.C. § 2000e-2(a)(1); Mass. Gen. L. ch. 151B, § 4(1). Furthermore, termination constitutes an adverse employment action. See Douglas v. J.C. Penney Company, Inc., 442 F.Supp.2d at 273. Finally, defendant does not contest that it sought to replace plaintiff with a similarly qualified employee; nor does defendant argue that

32

plaintiff's position was eliminated upon his termination.

Defendant does maintain, however, that plaintiff was not performing his job at an acceptable level and therefore fails to establish a prima facie case. (Docket Entry # 15). To support this position, defendant points to plaintiff's failure to respond in person to resolve problems on the train tracks, his failure to follow the directives of supervisors, his transfer from the day to the second shift and his disciplinary record. (Docket Entry # 15).

The only evidence put forth in the record that plaintiff failed to adequately respond in person to problems on the tracks relates to the September 12, 2006 incident that led to his termination. The Arbitrator later found that plaintiff could have reasonably misinterpreted Supervisor Hagan's directive to report to Sullivan Square Station. (Docket Entry # 16, Ex. 2). Furthermore, the Arbitrator found that the situation had been sufficiently resolved and that it was acceptable for plaintiff to complete his monitoring without reporting to Sullivan Square Station. (Docket Entry # 16, Ex. 2). This incident, therefore, does not provide an adequate basis to allow summary judgment based on the absence of a prima facie showing that plaintiff failed to perform his job at an acceptable level.

Next, defendant points to the November 2004 incident in which plaintiff allegedly failed to follow Supervisor Fairhust's directive as evidence of plaintiff's pattern of insubordination. (Docket Entry # 15). In contrast, plaintiff testified that he failed to follow Supervisor Fairhust's directive due to a safety issue. (Docket Entry # 19, Ex. A). Defendant also claims that plaintiff was moved from the day shift to the second shift in November of 2005 after "several similar instances" of insubordination. (Docket Entry # 15). The only other instance of insubordination put forth in the record, however, relates to plaintiff's failure to move to his newly assigned office space at Riverside Station in January 2004. (Docket Entry # 16, ¶ 13). This incident occurred before the alleged incident of insubordination in November 2004. Accordingly, defendant fails to adequately support its allegation of "several similar instances" of insubordination between November 2004 and November 2005. While the two named instances of alleged insubordination are not insignificant, there is a dispute regarding the facts surrounding the November 2004 incident. This factual dispute is resolved in plaintiff's favor.

Defendant further argues that plaintiff's transfer from the day shift to the less busy second shift was a result of his poor

job performance.  (Docket Entry # 15).  Drawing all inferences in the summary judgment record in favor of plaintiff, defendant's allegation of poor performance is insufficient to show that plaintiff was not performing his job at an acceptable level.

Finally, defendant relies on the "written record documenting the plaintiff's failure to perform satisfactorily" as evidence of his failure to perform his job at an acceptable level.  (Docket Entry # 15).  In particular, defendant identifies five incidents of written discipline spanning a seven year period.  Plaintiff's discipline file consists of an April 12, 1999 discipline for working overtime without authorization; a September 10, 2003 discipline for which defendant provides no information regarding the specific infraction; a February 12, 2004 three day suspension for attendance issues; a November 2004 five day suspension for insubordination and plaintiff's termination; and the September 12, 2006 incident that led to plaintiff's termination.

Inasmuch as the Arbitrator determined that defendant lacked just cause to terminate plaintiff, defendant cannot rely on the September 12, 2006 incident to support a showing that plaintiff failed to perform his job at an acceptable level.  Furthermore, because plaintiff offers an alternative explanation of discrimination for both of the 2004 incidents and drawing all

inferences in plaintiff's favor, these incidents do not defeat plaintiff's adequate showing on the second element of a prima facie case.

As to the 2003 discipline, the record fails to identify the infraction. Without further information, such evidence does not provide sufficient evidence to find that plaintiff failed to perform his job at an acceptable level particularly in light of the minimal showing required to establish a prima facie case. Finally, the 1999 discipline occurred seven years prior to plaintiff's termination. This is the only uncontested, documented discipline in the record. Standing alone, this discipline cannot and does not defeat plaintiff's prima facie showing that seven years later in 2006 he was performing his job at an acceptable level.

In short, the incidents in question do not amount to a showing that plaintiff was failing to perform his job at an acceptable level. The employee's initial burden of establishing a prima facie case of discrimination is not an onerous one. See Douglas v. J.C. Penney Company, Inc., 442 F.Supp.2d at 273. Plaintiff puts forth sufficient evidence to show that he was performing his job at an acceptable level. He had been employed by defendant for 17 years and had worked as a Signal Inspector

for 15 years.  (Docket Entry # 16).  Following the September 12, 2006 incident, plaintiff's supervisors recommended plaintiff be demoted rather than terminated.  Plaintiff's length of employment combined with his supervisor's reluctance to terminate him is sufficient to show that he was performing his job at an acceptable level.  Accordingly, because plaintiff succeeded in establishing a prima facie case of racial discrimination with respect to his termination, this court turns to the issue of whether defendant offered a legitimate, non-discriminatory reason for the termination.

2.  <u>Non-discriminatory Reason</u>

Defendant contends it had a legitimate, non-discriminatory business reason to terminate plaintiff.  Due to plaintiff's disciplinary history, he was on a final warning when he failed to follow the directive of Supervisor Hagan on September 12, 2006. The next step in the disciplinary process was termination. Plaintiff in turn maintains that the reasons for the termination advanced by defendant are not the real reasons but, instead, are a pretext for racial discrimination.  (Docket Entry # 18).

The summary judgment record more than adequately establishes a legitimate, non-discriminatory reason for the termination.  The May 2, 2007 termination letter from General Manager Grabauskas

sets out the MBTA's reasons for the discharge, to wit,

plaintiff's violation of Rule Five for not obeying the orders of

Supervisor Hagan to report to Sullivan Station and plaintiff's

prior disciplinary record of misconduct.  The prior disciplinary

record includes the November 2004 discipline for insubordination

for allegedly not following the directive of Supervisor

Fairhurst, an African American.  The MBTA informed plaintiff that

he had therefore reached the final warning stage under its

progressive disciplinary policy with the next step being

termination.

In addition to the prior disciplinary record and the MBTA's

adherence to its stated disciplinary policy, there is little, if

any, indication that Supervisor Hagan did not believe she gave

plaintiff a direct order to report to Sullivan Square Station on

September 12, 2006.  Termination was the next step in defendant's

progressive disciplinary policy.  After discussions and an

interview with plaintiff, Superintendent Cary, Deputy Director

Bertozzi, Director Lewis and Senior Director O'Reilly, however,

recommended the lesser sanction that plaintiff be demoted rather

than discharged.  The labor relations department subsequently

determined it was more appropriate to discharge plaintiff in

light of his disciplinary record and his plan to grieve the

matter regardless of whether he was demoted or discharged.

Plaintiff thereafter received the disciplinary slip finding

plaintiff in violation of "Rule#5, Insubordination" and issuing a

suspension for 30 days with a recommendation for discharge.

(Docket Entry # 16, Ex. 2, Tab 10).

Insubordination typically provides a legitimate reason for

an adverse employment action such as termination.  See Windross

v. Barton Protective Services, Inc., 586 F.3d 98, 104 (1st Cir.

2009) (collecting cases).[8]  The circumstances of this case more

than justify the legitimate and non-discriminatory basis of the

proffered reason.  Accordingly, this court turns to whether the

reason was a mere pretext with the real reason being

discrimination on the basis of race.  See Quinones v. Buick, 436

F.3d 284, 289 (1st Cir. 2006).

---

[8]    The First Circuit in Windross cited the following cases:

See Tate v. Dep't of Mental Health, 419 Mass. 356, 645
N.E.2d 1159, 1164 (1995) (summary judgment justified when
deaf social worker failed to establish pretext under Title
VII and Massachusetts General Laws chapter 151B when fired
for insubordination); see also Williams, 220 F.3d at 19
(summary judgment justified when male employee failed to
establish case under Title VII when he was fired for
insubordination); Holloway v. Thompson Island Outward Bound
Educ. Center Inc., 492 F.Supp.2d 20, 24-25 (D.Mass. 2007)
(insubordination is a legitimate ground for termination of
an employee under Title VII).

Windross v. Barton Protective Services, Inc., 586 F.3d at 104.

3.  Pretext

   Federal and state standards regarding the significance of
pretext in proving discrimination differ.  Under federal law, a
prima facie case plus pretext may be used as evidence to infer
discrimination.  Reeves v. Sanderson Plumbing Products, Inc., 130
U.S. at 147.  It is not enough, however, to disbelieve the
defendant's explanation for the adverse employment action because
the fact finder must believe the plaintiff's version of events.
Id.

   Pretext may be used to infer discrimination, just as any
other piece of circumstantial evidence may be used to make an
inference, but a finding of pretext does not require an inference
of discrimination.  Id.  At this stage, it is the plaintiff's
burden "to demonstrate that the non-discriminatory reason is mere
pretext and that the real reason was discrimination."  Quinones
v. Buick, 436 F.3d at 289.[9]  Chapter "151B appears slightly less
stringent, in that it would allow a plaintiff to overcome a
motion for summary judgment if the plaintiff shows that just one

_____

        [9]   As also noted by the court in Quinones, "At the summary
judgment stage, the plaintiff 'must produce evidence to create a
genuine issue of fact with respect to two points:  whether the
employer's articulated reason for its adverse action was a
pretext and whether the real reason was [national origin]
discrimination.'"  Id. at 289-290 (brackets in original).

of the proffered reasons was pretextual." <u>Douglas v. J.C. Penney</u>
<u>Co., Inc.</u>, 474 F.3d 10, 14 n.2 (1st Cir. 2007).

Plaintiff argues that the facts taken as a whole are
sufficient to show that the reason given by defendant for the
termination was merely a pretext. (Docket Entry # 18).
Specifically, plaintiff argues that he was treated differently
than his coworkers; his direct supervisors recommended him for
demotion rather than termination; he was not terminated for over
six months following his suspension; "someone in labor relations
. . . had it out" for him; he was treated differently than a
Caucasian employee in relation to the September 12, 2006
incident; it is not clear who made the final decision to
terminate his employment; the Arbitrator found a lack of just
cause for plaintiff's termination; the decision to terminate
plaintiff occurred two weeks before the expiration of his 2004
discipline; and there was never an adequate investigation of the
2006 incident that led to the termination. (Docket Entry # 18).

Notwithstanding plaintiff's assertions, these events taken
as a whole do not amount to an inference of pretext. Plaintiff
produced little, if any, evidence that he was treated differently
than other employees prior to the 2006 termination. Plaintiff's
November 2004 suspension is the only incident prior to the

termination for which plaintiff makes a disparate treatment argument. To support plaintiff's claim that he was treated differently, plaintiff compares himself to the night shift Signal Inspector, a Caucasian.[10] (Docket Entry # 19, Att. B). Plaintiff points out, correctly, that the night shift Signal Inspector was not disciplined even though he handled the track problem in the same manner as plaintiff. (Docket Entry # 19, Att. A & B). Plaintiff however does not assert that this Signal Inspector ignored a supervisor's directive. Rather he disregarded plaintiff's directive. (Docket Entry # 19, Att. B).

Additionally, the Arbitrator's ruling that defendant lacked just cause to terminate plaintiff's employment does not lead to an inference of pretext. The Arbitrator's ruling was based on defendant's failure to properly investigate and document its case and the potential for a reasonable misinterpretation of Supervisor Hagan's directive. (Docket Entry # 16, Ex. 2). The decision does not provide a sufficient basis to infer that the reason for the termination was a pretext. Indeed, nowhere does plaintiff establish or show that Supervisor Hagan did not truly

---

[10] Assuming dubitante that plaintiff attempts to use Ford as a comparator, Ford is an African American thereby undermining any claim that plaintiff was treated differently due to his race vis-à-vis Ford.

believe she had ordered plaintiff to report to Sullivan Square Station.  In addition, the Arbitrator made no finding of pretext or discrimination.  (Docket Entry # 16, Ex. 2).

It is true that plaintiff provides evidence that Smith, a Caucasian Signal Inspector, was not disciplined even though he took the same actions as plaintiff to resolve the problem on September 12, 2006.  That said, plaintiff fails to identify what shift Smith works on, Smith's prior disciplinary history such as whether he was on a final warning, whether he received a directive to report in person to Sullivan Square Station or whether Smith was responsible for resolving the incident at Sullivan Square.  Plaintiff's comparison thus fails to satisfy his underlying burden on summary judgment to provide sufficient evidence of pretext.

Simply put, plaintiff fails to provide sufficient facts to support an inference that the termination amounts to more than a disagreement with defendant regarding its disciplinary policies and rule violations.  Thus, plaintiff produces insufficient evidence that the reason for the discharge was false or pretextual as well as that the true reason was racial discrimination.

Although it is unclear who made the final determination to

terminate plaintiff,[11] it is undisputed that termination was the next step in the disciplinary process. (Docket Entry # 16, ¶ 23). Therefore, this discrepancy in the record does not support the inference that the decision to terminate plaintiff was a pretext for discrimination. Additionally, Deputy Director Bertozzi and Superintendent Cary are among the managers who advocated for demotion rather than termination. (Docket Entry # 16, ¶ 23). These are the same managers plaintiff holds responsible for the alleged discrimination against him. (Docket Entry # 3, ¶ 12). Moreover, plaintiff's claims that "somebody in labor relations" advocated for the termination contradicts his claims that his direct supervisors are responsible for the discrimination against him. (Docket Entry # 3, ¶ 12). Rather than leading to the inference that defendant used the incident as a pretext to discriminate against plaintiff, these facts show that the very managers plaintiff accuses of discrimination attempted to maintain his employment. In other words, resolving these discrepancies in plaintiff's favor still fails to provide sufficient evidence of pretext to avoid summary judgment.

Finally, plaintiff makes an argument that the timing of the

---

[11] General Manager Grabauskas signed the termination letter.

termination creates an inference of pretext. (Docket Entry # 18). On October 24, 2006, plaintiff met with Supervisor Fairhurst who issued plaintiff the discipline slip stating plaintiff was found "in violation Rule#5, Insubordination." The discipline slip also informed plaintiff that he was "hereby suspended for thirty (30) days with a recommendation for discharge." (Docket Entry # 16, Ex. 2, Tab. 10; Docket Entry # 16, ¶ 28). It is true that the suspension continued after the 30 day period expired. Defendant, however, accounts for every step of the termination process. Irrespective of a grievance review,[12] once there is a recommendation for discharge, such as the October 24, 2006 recommendation, the entire file, including discipline slips, is forwarded to the labor relations department.[13] The length of time it took to complete the termination process does not suggest pretext but rather inefficiency due to labor

---

[12] As permitted under the applicable collective bargaining agreement, plaintiff grieved the discipline in early November. At the time, Bertozzi testified there had "been a problem in the past expediting the paperwork" relative to a grievance. (Docket Entry # 16, Ex. 8, p. 26).

[13] For example, Deputy Director Bertozzi testified that once there is a recommendation for a discharge, the file is forwarded to the labor relations department before the termination takes place. (Docket Entry # 16, Ex. 8, p. 48-49). Coleman concurred and testified about the same process. (Docket Entry # 16, Ex. 15, pp. 18-20).

relations review and further review thereafter culminating with General Manager Grabauskas's May 2, 2007 termination letter.

In addition, the issuance of the termination recommendation two weeks prior to the expiration of plaintiff's 2004 discipline does not suggest plaintiff was terminated for any other reason than insubordination. The September 12, 2006 incident occurred at least seven weeks before the expiration of his 2004 discipline. Furthermore, defendant began the investigation and discipline process immediately following the September 12, 2006 incident. (Docket Entry # 16, ¶ 20). The facts put forth in the record, taken as a whole and drawing all reasonable inferences in favor of plaintiff, fail to suggest anything other than a business decision for the suspension and termination based on a rule violation prescribing insubordination and a prior disciplinary history.

Furthermore, nowhere in the record does plaintiff credibly allege discrimination prior to his termination.[14] Rather, the incidents plaintiff identifies to support his charge of racial discrimination often reveal an unrelated, underlying dispute. For example, although plaintiff included Supervisor McCabe's

---

[14] In addition to lack of racial animus, defendant argues that the events are untimely.

46

decision to change plaintiff's personnel list in the summer of 2005 as evidence of racial discrimination, plaintiff testified at his deposition that he believes Supervisor McCabe made the change because his wife, a fellow MBTA employee, was jealous of plaintiff's assignment. (Docket Entry # 19, Ex. B). Furthermore, plaintiff testified at his deposition that his shift was switched against his will in retaliation for complaining about a pay issue and seeking the advice of an attorney. (Docket Entry # 19, Ex. B). Plaintiff's own version of events therefore suggests underlying conflicts unrelated to race.

The other incidents prior to October 2006 lack sufficient detail and/or probative force. For example, Supervisor McCabe delayed payment of overtime pay to plaintiff and his team in September 2005. (Docket Entry # 19, ¶ 1(c) & Ex. B, p. 7). The team received a delayed payment after two weeks and plaintiff received payment after a two month delay. (Docket Entry # 19, Ex. B, p. 7). Not only was the delay initially team wide, as opposed to specific to plaintiff because of his race, but without further comparison or additional context for the delay the cited portion of the record upon which plaintiff relies does not lead to a reasonable inference of pretext or discrimination. Although plaintiff testified to a reduction in overtime to an estimated

$5,000 figure in 2005 presumably from the normal overtime of

between $10,000 to $20,000 annually (Docket Entry # 19, Ex. C,

pp. 143-144), the testimony fails to provide the context of the

denial.[15]

Plaintiff's assertion that he was active throughout his

career in supporting African Americans employed by the MBTA is

not probative of pretext or discrimination without an additional

showing of some causal nexus. The activity plaintiff describes

dates back to the 1990s. He fails to note any recent activity in

support of African Americans employed by defendant, other than

his aforementioned "eulogy at the funeral a Black MBTA coworker."

(Docket Entry # 19, ¶ 1(j)). Plaintiff fails to make even a

tenuous connection between his efforts to assist his fellow

employees and his termination.

Furthermore, many of the efforts plaintiff describes lack

sufficient detail to demonstrate that defendant was aware of

---

[15] The allegation of a denial of overtime in 2005 is also
untimely as discussed infra. Plaintiff alleges a denial of
overtime before 2006 and "in" and "after" 2008. (Docket Entry #
19, Ex. C, pp. 89-90 & 143-144). This court expresses no opinion
as to the reduction of overtime after October 2006 as
discriminatory because, as previously explained, defendant does
not seek summary judgment on the discriminatory conduct after the
Arbitrator's decision and plaintiff's return to work in counts
one and two.

these efforts.  For example, plaintiff asserts he helped mediate problems between an African American Maintainer and Caucasian Maintainers.  (Docket Entry # 19, Ex. B).  Plaintiff however fails to disclose the nature of the dispute, the approximate date of the dispute or even whether the dispute was race related. (Docket Entry # 19, Ex. B).

Finally, defendant submits that the acts that took place before October 6, 2006, are untimely.  "Title VII and Chapter 151B require plaintiffs to file claims with the EEOC and the MCAD before filing suit in court and within 300 days of complained acts of discrimination."  Diaz v. Jiten Hotel Management, Inc., 762 F.Supp.2d 319, 327 (D.Mass. 2011); Alston v. Massachusetts, 661 F.Supp.2d 117, 123 (D.Mass. 2009) (the "plaintiff must file a Title VII or 151B claim within 300 days of the discriminatory act"); 42 U.S.C. § 2000e-5(e); Mass. Gen. L. ch. 151B, § 5. Although this court considers the acts prior to the 30 day suspension and eventual termination as background evidence, they are otherwise untimely.  See Vesprini v. Shaw Contract Flooring Services, Inc., 315 F.3d 37, 42 n.4 (1st Cir. 2002) ("'discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges'" although they may provide "'background evidence'" to support

49

timely claim).

In sum, the record fails to provide sufficient evidence of pretext to survive summary judgment under chapter 151B. Plaintiff similarly fails to meet his underlying burden to show sufficient evidence of pretext and that the real reason for the termination was discrimination under Title VII. In addition, the discrete acts of alleged discriminatory conduct occurring before the October 2006 suspension and recommended termination are untimely. The racial discrimination claims in counts one and two based on unlawful suspension and termination are therefore subject to summary judgment.

II. <u>Retaliation</u>

In counts three and four, plaintiff alleges that defendant terminated him in retaliation for complaining to Senator Kennedy about racial discrimination at the MBTA in the November 6, 2006 letter. Defendant seeks summary judgment due to the absence of a causal link.

Plaintiff additionally alleges chapter 151B and Title VII retaliation claims based on conduct that took place after the Arbitrator ordered plaintiff's reinstatement in October 2007 and after plaintiff returned to work in January 2008. Plaintiff asserts the latter claims based upon retaliation for the August 7,

2007 filing of charges with the MCAD and EEOC.  Defendant

challenges these claims due to the absence of a materially adverse

employment action as well as a causal link with the protected

activity of the August 2007 filing of the discrimination charge

with the MCAD and the EEOC.

1.  <u>Retaliation Based on Letter to Senator Kennedy</u>

In order to establish a retaliation claim under Title VII,

the plaintiff must show that:  (1) he engaged in protected

conduct; (2) he suffered some adverse employment action; and (3)

"the two were causally linked."  <u>Noviello v. City of Boston</u>, 398

F.3d 76, 88 (1st Cir. 2005); <u>see</u> <u>Navarro v. U.S. Tsubaki, Inc.</u>, 577

F.Supp.2d 487, 500-501 (D.Mass. 2008) (further noting that, "[i]f

the defendant did not know that the plaintiff undertook conduct

that was protected, then any subsequent adverse employment action

cannot be linked to the protected conduct").[16]  The "plaintiff

needs to prove that protected conduct and an adverse employment

action are causally linked."  <u>Douglas v. J.C. Penney Co., Inc.</u>,

---

[16]  Like Title VII, chapter 151B contains a similar
retaliation prohibition.  <u>Billings v. Town of Grafton</u>, 515 F.3d
39, 52 n.12 (1st Cir. 2008); Mass. Gen. L. Ch. 151B, § 4(4A).
Neither party distinguishes the standard of liability for
retaliation under Title VII from the standard under chapter 151B.
Accordingly, the chapter 151B retaliation claim "rises or falls"
in the same manner as the Title VII claim.  <u>Billings v. Town of
Grafton</u>, 515 F.3d at 52 n.12.

474 F.3d 10, 15 (1st Cir. 2007).

   Plaintiff first contends he was terminated in retaliation for his letter to Senator Kennedy in which he accused defendant of racial discrimination.  Although asserting the right to be free from racial discrimination at work is a protected activity under both Title VII and chapter 151B and termination is a materially adverse employment action, plaintiff fails to draw a causal connection between these two events.  <u>See</u> Mass. Gen. L. ch. 151B, § 4; 42 U.S.C. § 2000-e(3)(a); <u>Douglas v. J.C. Penney Company, Inc.</u>, 474 F.3d at 15 (retaliation claim requires causal link).

   On October 24, 2006, Supervisor Fairhurst issued a discipline slip informing plaintiff of the 30 day suspension and the "recommendation for discharge."  (Docket Entry # 16, Ex. 2, Tab 10).  Plaintiff wrote to Senator Kennedy's office on November 6, 2006, 13 days after he had received notice of the recommended termination.  (Docket Entry # 16, ¶ 29).  Defendant did not learn of plaintiff's letter to Senator Kennedy until December 7, 2006, 44 days after plaintiff received the October 24, 2006 disciplinary slip recommending discharge.  The recommended discharge then proceeded along the normal course of review by the labor relations department culminating in the termination by letter dated May 2, 2007.  The discussion and decision regarding a demotion occurred

prior to the October 24, 2006 discipline slip.  Thereafter, the
recommended termination did not change.

   An adverse employment action that predates an employer's
knowledge that an employee engaged in protected activity cannot
lead to an inference that the adverse action was motivated by
retaliation.  <u>Mole v. University of Massachusetts</u>, 814 N.E.2d 329,
340 (Mass. 2004) (citing <u>Clark County School District v. Breeden</u>,
532 U.S. 268, 272 (2001), a Title VII case).  Not only was
defendant unaware of plaintiff's protected activity until 44 days
after the adverse employment action, but plaintiff did not engage
in a protected activity until after receiving notice that he was
being terminated.  Therefore, no logical causal connection can
reasonably be inferred between plaintiff's termination and
plaintiff's letter to Senator Kennedy.

   Plaintiff attempts to distinguish this timeline by pointing
out that Coleman was the person who drafted the reply letter to
Senator Kennedy and Coleman was also instrumental in the decision
to discharge plaintiff rather than demote him.  The argument
overlooks that Coleman's involvement in the decision to demote and
his preference for termination preceded the October 24, 2006
discipline slip that recommended termination and, more notably,
the MBTA's receipt of Senator Kennedy's reply letter.  This

53

involvement on the part of Coleman took place well before the

protected activity. Moreover, the steps that followed, while

lengthy, proceeded on the procedural path set out in the MBTA's

prescribed policy. Thus, although Coleman engaged in conduct

after the MBTA's receipt of Senator Kennedy's reply letter, there

is no showing that he changed his mind from his prior termination

position. The following cases paraphrased by the court in <u>Mole</u>

demonstrate that plaintiff's attempt to draw the necessary causal

connection is misguided:

> <u>See</u>, <u>e.g.</u>, <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268,
> 272, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam)
> (employer commented about transferring plaintiff shortly
> prior to learning of plaintiff's Title VII claim, and
> transferred plaintiff one month after learning of suit;
> employer "proceeding along lines previously contemplated,
> though not yet definitively determined, is no evidence
> whatever of causality"); <u>Hoeppner v. Crotched Mountain
> Rehabilitation Ctr.</u>, 31 F.3d 9, 12, 14-16 (1st Cir. 1994)
> (employee already on probation prior to filing claim of
> sexual harassment; although discharge occurred within days of
> employee's filing claim, summary judgment entered in favor of
> employer); <u>Dziamba v. Warner & Stackpole LLP</u>, 56 Mass.App.Ct.
> 397, 407, 778 N.E.2d 927 (2002) (summary judgment for
> employer on retaliatory discharge claim where "expressions of
> dissatisfaction, warnings about unsatisfactory
> accomplishment, and not raising his salary had begun well
> before" employee's assertion of rights); <u>Prader v. Leading
> Edge Prods., Inc.</u>, 39 Mass.App.Ct. 616, 617-618, 659 N.E.2d
> 756 (1996) (employee fired after receiving back pay award
> claimed retaliation; summary judgment for employer based on
> prior performance evaluation which, "although in general
> favorable to the plaintiff, stated that the plaintiff needed
> improvement" in various categories).

<u>Mole v. University of Massachusetts</u>, 814 N.E.2d at 340.

Accordingly, plaintiff fails to establish a genuine issue of material fact that the protected conduct of the November 6, 2006 letter to Senator Kennedy and the adverse action of the May 2007 termination are causally linked. Summary judgment is therefore warranted on these retaliatory discharge claims in counts three and four.

   2. <u>Retaliation Upon Return to Work</u>

In counts three and four, plaintiff alleges he suffered retaliation for filing the MCAD and EEOC charges in August 2007. (Docket Entry # 3, ¶¶ 23-29 & 34-37). The alleged misconduct took place after the Arbitrator ordered plaintiff reinstated in October 2007 and after plaintiff returned to work in January 2008. To support this allegation, plaintiff points to factual evidence in the summary judgment record consisting of Coleman's letter threatening to terminate plaintiff for failure to attend his back to work physical, denial of overtime assignments, his assignment to a "'dead end'" new position, undue pressure to finish paperwork and being forced to share office space with Vey. (Docket Entry # 18; Docket Entry # 19, ¶ 5). Defendant challenges these retaliation claims on the basis that plaintiff did not suffer an adverse employment action after his return to work and he cannot

establish the requisite causal link.  (Docket Entry # 14; Docket
Entry # 15, § C(2)).

Similar to a discrimination claim, "a plaintiff alleging
workplace retaliation must prove, among other things, that he
suffered an 'adverse employment action' on account of a protected
activity."  Morales-Vallellanes v. Potter, 605 F.3d 27, 36 (1st
Cir. 2010).  Unlike a discrimination claim, however, a retaliation
claim is based upon conduct as opposed to discriminatory motive.
See DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008) (Title VII's
"'anti-retaliation provision seeks to prevent harm to individuals
based on what they do, i.e., their conduct'") (quoting Burlington
N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63 (2006)).  The
anti-retaliation provision is also broader than the substantive
discrimination provision because the "conduct need not relate to
the terms or conditions of employment to give rise to a
retaliation claim."  Billings v. Town of Grafton, 515 F.3d 39, 54
(1st Cir. 2008); accord Morales-Vallellanes v. Potter, 605 F.3d at
36 (quoting Billings, 515 F.3d at 54).

In addition, the adverse employment action must be materially
adverse.  See Billings v. Town of Grafton, 515 F.3d at 52.  The
inquiry under Title VII is also an objective one wherein the
plaintiff must show that a reasonable employee would have found

56

the action materially adverse.  See <u>Burlington Northern & Santa Fe</u> <u>Railway Co. v. White</u>, 548 U.S. 53, 68 (2003); <u>see also</u> <u>King v.</u> <u>City of Boston</u>, 883 N.E.2d 316, 323 (Mass.App.Ct. 2008) (adverse employment action under chapter 151B "arises when objective aspects of the work environment are affected" and "'subjective feelings of disappointment and disillusionment' will not suffice").  Thus, "to prevail on a claim of retaliation in violation of Title VII, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  <u>Billings v. Town of Grafton</u>, 515 F.3d at 52 (quoting <u>Burlington Northern</u>, 548 U.S. at 68)

While the harms plaintiff alleges could amount to a finding of material adversity, plaintiff fails to provide facts in sufficient detail to satisfy his underlying burden of showing a materially adverse employment action on account of protected activity.  By plaintiff's own admission the back to work physical was a blanket requirement for any employee returning from a leave of absence.  (Docket Entry # 19, Ex. C).  The absence of evidence that defendant treated plaintiff differently in the enforcement of the back to work physical weakens the retaliation claim.  <u>See</u>,

e.g., Morales-Vallellanes v. Potter, 605 F.3d at 37 (allegation that supervisor closely monitored the plaintiff's coffee and lunch breaks after he submitted EEOC complaint subject to summary judgment because he "was not treated differently than other employees"). Moreover, although the letter may have been unsettling given plaintiff's employment history with defendant, no disciplinary action was taken. As a matter of law, a reasonable employee would not be dissuaded from making or supporting a discrimination charge.

Turning to the denial or reduction of overtime assignments (Docket Entry # 19, ¶¶ 1(f) & 5(b)), plaintiff testified that the MBTA, in particular Superintendent Cary and Supervisor McCabe, would not allow plaintiff to work overtime in 2005 and in and after 2008.[17] He elaborates in an interrogatory answer that he "was not allowed to work overtime for years, costing [him] approximately $25,000.00 each year since 2005." (Docket Entry # 19, Ex. B, p. 13). Such testimony, however, fails to provide sufficient facts to support a causal connection, i.e., that his overtime was cut in 2008 on account of protected activity in the form of filing the EEOC and MCAD charges in August 2007. To the

---

[17] As previously explained, any denial of overtime in 2005 or prior to October 2006 is untimely.

contrary, the ongoing and unchanged nature of the overtime denials and reductions belies the existence of a causal link because the denials and reductions took place prior to the filing of the MCAD and EEOC charges and continued thereafter.

Further, the cited portion of plaintiff's deposition lends additional support to the absence of a causal connection. In particular, plaintiff testified that Superintendent Cary liked to reward or "thank people when they do good work" with "a piece of overtime." (Docket Entry # 19, Ex. C, pp. 90-91). "So in other words, if I didn't get the overtime I wasn't doing good work." (Docket Entry # 19, Ex. C, p. 90). Thus, the portion of the summary judgment record that plaintiff identifies to support the allegation of denied overtime is one wherein he acknowledges that Superintendent Cary denied overtime if the employee was not doing good work and/or, "If he didn't like you." (Docket Entry # 19, Ex. C, pp. 91). Such testimony belies a causal link between the protected activity of filing the EEOC or MCAD charges and the subsequent retaliation of denied overtime.[18] Accordingly, plaintiff has not met his summary judgment burden as to the retaliation claims based on denied or reduced overtime. <u>See</u>

_____

[18] Plaintiff also testified at his deposition that Carey "reward[ed]" him with a little bit *more* overtime in 2009.

<u>Torres-Martinez v. Puerto Rico Department of Corrections</u>, 485 F.3d 19, 22 (1st Cir. 2007) ("'[a]s to issues on which the summary judgment target bears the ultimate burden of proof, [he] cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute'"); <u>Triangle Trading Company, Inc. v. Robroy Industries, Inc.</u>, 200 F.3d 1, 2 (1st Cir. 1999) (where nonmoving party bears the underlying burden at trial, he must "produce 'specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue'"); <u>FDIC v. Elder Care Services, Inc.</u>, 82 F.3d 524, 526 (1st Cir. 1996) (if party resists summary judgment by pointing to "factual dispute on which it bears the burden at trial, that party must point to evidence affirmatively tending to prove that fact in its favor").

As to the April 2009 job assignment, "In appropriate circumstances, disadvantageous work assignments may qualify as materially adverse." <u>Morales-Vallellanes v. Potter</u>, 605 F.3d at 38; <u>see</u> <u>also</u> <u>Billings v. Town of Grafton</u>, 515 F.3d at 53 ("'reassignment of job duties is not automatically actionable'") (quoting <u>Burlington Northern</u>, 548 U.S. at 71). Plaintiff described the new position as a "'dead end' position" having "no name, no number" and that it involved writing reports and

inspecting crossovers.  (Docket Entry # 19, Ex. C, pp. 147-148).

Plaintiff also testified that defendant provided copies of the

inspection reports plaintiff wrote to the subject individuals.

(Docket Entry # 19, Ex. C, pp. 142 & 147-148; Docket Entry # 19, ¶

5(c);[19] Docket Entry # 18, p. 17).  The April 2009 position however

did not result in a change of base pay and, in fact, "sometimes"

Superintendent Cary rewarded plaintiff with overtime.  (Docket

Entry # 19, Ex. C, p. 148).  At most, the altered job

responsibilities, such as writing the inspection reports, involved

different responsibilities that would not deter a reasonable

employee from making or supporting a discrimination charge.

Plaintiff's single sentence in the SOF (Docket Entry # 19, ¶

5(c)) and the referenced deposition testimony (Docket Entry # 19,

Ex. C, pp. 142 & 147-148) also provide no comparison between the

duties of the signal inspector on the Red Line and the April 2009

"'dead end' position."  Cf. Billings v. Town of Grafton, 515 F.3d

at 53 (vacating and remanding allowance of summary judgment on

retaliation claim noting that the plaintiff "came forward with

enough objective evidence contrasting her former and current jobs

_____

[19]  These pages of plaintiff's deposition and paragraph 5(c)
of the SOF are the only evidence plaintiff identifies in the
summary judgment record to support the retaliatory job assignment
to the "'dead end' position."

to allow the jury to find a materially adverse employment action"). The memorandum in opposition to summary judgment only alleges that he was "placed in a 'dead end' position" and "there was no reason for . . . removing him from his Red Line job and placing him in a 'dead end' position." (Docket Entry # 18, pp. 8 & 17). As the summary target with the underlying burden of proof, plaintiff fails to meet that burden both as to a materially adverse employment action and the necessary causal link.

Plaintiff next submits that Superintendent Cary placed undue pressure upon plaintiff to supply him with paperwork. (Docket Entry # 18). Plaintiff supports this assertion with a single statement in the SOF that Superintendent "Cary continually placed undue pressure on [plaintiff] to supply him with paperwork." (Docket Entry # 19, ¶ 5(d)). The SOF also references page seven of plaintiff's interrogatory answers. The cited page refers to Supervisor McCabe, as opposed to Superintendent Cary, harassing plaintiff "for paperwork immediately" and making "sure he received the paperwork by the end of [plaintiff's] shift" and sending plaintiff daily emails. (Docket Entry # 19, Ex. B, p. 7). The testimony fails to provide sufficient evidence of a causal link to withstand summary judgment. It also establishes no more than the kind of minor annoyances that lie outside the scope of Title VII's

anti-retaliation provision.

Plaintiff's shared office space with Vey and his racist
remarks is the final incident plaintiff describes to support the
retaliation claims based on misconduct subsequent to the
arbitration award and the January 2008 return to work. (Docket
Entry # 19, Ex. A, pp. 76-80; Docket Entry # 19, ¶ 5(e); Docket
Entry # 18, pp. 9 & 17). The events however indicate that rather
than support retaliation against plaintiff, defendant through the
acts of Superintendent Cary attempted to resolve the problem.
(Docket Entry # 19, Ex. A). Plaintiff testified that
Superintendent Cary assigned a night detail to plaintiff to ensure
no further problems arose. (Docket Entry # 19, Ex. A).
Furthermore, plaintiff testified that Vey was ordered not to enter
the office while plaintiff was present. (Docket Entry # 19, Ex.
A). Plaintiff's own deposition testimony therefore supports the
inference that defendant attempted to resolve a race based
workplace problem not that defendant engaged in materially adverse
employment action by placing him in close contact with Vey or that
putting him in close contact with Vey was causally linked to the
August 2007 filing of the EEOC and MCAD charges. Hence, plaintiff
again fails to meet his underlying burden as the summary judgment
target.

Finally, viewing the above purportedly retaliatory incidents collectively as opposed to discrete individual retaliatory changes at the MBTA, they still fail to withstand summary judgment given the absence of a trialworthy issue relative to materially adverse actions and causal link.  See generally Billings v. Town of Grafton, 515 F.3d at 54 n.13.


## CONCLUSION

Accordingly, this court **RECOMMENDS**[20] that defendant's motion for summary judgment (Docket Entry # 14) be **ALLOWED**.  As explained in the procedural history section, certain claims remain in this action notwithstanding the recommended allowance of summary judgment.


    /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[20] Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  Any party may respond to another party's objections within 14 days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order.